United States District Court
Southern District of Texas
**ENTERED**
March 26, 2021
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| | § | |
| Global Tubing, LLC, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Case No. 4:17-CV-3299 |
| | § | |
| Tenaris Coiled Tubes, LLC and | § | |
| Tenaris, S.A., | § | |
| | § | |
| *Defendants.* | § | |

## Memorandum Order

Pending before the Court are Plaintiff Global Tubing, LLC's ("Global" or "Plaintiff") motions to compel documents withheld as privileged and a declaration produced but then clawed back as privileged. ECF Nos. 133, 136.[1] The Court held an oral argument on the motions.[2] Tr. Mot. Hrg., ECF No. 201. Having considered the argument of counsel, the parties' filings,[3] and the applicable law, the Court

---

[1] United States District Judge Keith Ellison, to whom this case is assigned, referred these motions for disposition in accordance with 28 U.S.C. § 636(b)(1)(A). Order, ECF No. 172.

[2] Counsel provided the Court with copies of their presentation slides from the hearing.

[3] These motions engendered numerous responsive filings, including a response, reply, sur-reply, rejoinder, and two notices of subsequent events. ECF Nos. 144, 149, 155, 164, 156, 197. These filings contained hundreds of pages of exhibits. Because of the number of filings and exhibits, the Court requested the parties to provide indices to all the exhibits.

In addition, Defendant filed a motion to strike, to which Plaintiff filed a response, and Defendant filed a reply. ECF Nos. 166, 167, 169. The motion to strike is **DENIED AS MOOT** by the other rulings in this Order.

determines that Plaintiff's motions to compel should be granted.

## I.     BACKGROUND

This is a patent infringement suit.  Defendant Tenaris Coiled Tubes, LLC ("Tenaris" or "Defendant") is the owner of U.S. Patent No. 9,803,256 (the "'256 patent" or "main patent"), U.S. Patent No. 10,378,074 (the "'074 patent"), and U.S. Patent No. 10,378,075 (the "'075 patent") (collectively the '074 and '075 patents are referred to as the "Children Patents"). Plaintiff sued Defendants for, *inter alia*, declaratory judgment of inequitable conduct, non-infringement, and antitrust violations. Pl.'s 2d Am. Compl., ECF No. 80. Tenaris has counterclaimed for infringement. Def.'s Am. Ans. and Counterclaims, ECF No. 119.

This dispute involves patents for coiled tubing, which are very long, small-diameter steel tubes that are used in the oil and gas industry to conduct and service wellbore operations. The patents at issue provide for coiled tubing that is manufactured with a "quench and temper" process that makes the coiled tubing stronger and safer to meet the needs of shale oil extraction. According to the parties, only three companies make this type of tubing: Tenaris, Global Tubing, and Quality Tubing/NOV.

In the 1990s, Southwestern Pipe Inc. produced the first quench and temper tubing in the industry, known as CYMAX. ECF No. 133 at 5; Clark Depo., ECF No.

133-3 at 5.[4] Southwestern used its CYMAX system to make coiled tubing using a full-body continuous heat treatment applied to the entirety of the tube, including welds, and then quenched and tempered. ECF No. 133 at 5-6.

At the heart of both motions to compel is a notebook Southwestern created and distributed—all or part of—to its customers as a "sales brochure." *Id.* at 6; CYMAX Brochure, ECF No. 133-2. Plaintiff claims the evidence shows the entire notebook was given to customers. ECF No. 133 at 6; Clark Depo., ECF No. 133-3 at 5; Clark Depo., ECF No. 150-4 at 5-6. Defendant counters that the testimony of Tenaris' employee, who was a former Southwestern employee, Bill Clark,[5] is unclear and only part of the notebook was the sales brochure that was distributed to customers. ECF No. 144 at 20. Plaintiff claims that Southwestern distributed the CYMAX brochure openly and publicly. ECF No. 133 at 6; Clark Depo., ECF No. 133-3 at 3. Tenaris admits that Mr. Clark testified that the sales brochure was "generally" presented to customers as a single bound document. ECF No. 144 at 20-21.

---

[4] This Court cites references to the motion and various responses, which cite to the supporting evidence. Plaintiff provided the Court with its detailed timeline of events, most of which is cross-referenced to supporting documents in the record. CYMAX Timeline, ECF No. 133-1. For simplicity, the Court has cited to this supporting evidence only when critical to the analysis. Most of the background facts appear to be undisputed. Where a disagreement is significant to the analysis it is noted.

[5] Mr. Clark testified that after Southwestern went out of the coiled tubing business, Southwestern was acquired by Northwest Pipe. He worked in SeaCAT part of that company, which was eventually acquired by Maverick, and then Maverick was acquired by Tenaris. Up through 2015, he worked for Tenaris. Clark Depo., ECF No. 133-3 at 6.

The Specifications section of the brochure details the chemistry of the two grades of coiled tubing product. CYMAX Brochure, ECF No. 133-2 at 8-12. For the CYMAX100, the chemistry for the carbon content is .13-.17% wt., which appears on page 30 of the brochure. *Id.* at 11; ECF No. 133 at 6. Tenaris admits that Mr. Clark's testimony established the Specifications were included in the "sales brochure" materials. ECF No. 144 at 21. Significantly, this carbon content overlaps with the carbon content in the Defendants' patent '256 for its BlueCoil coiled tubing, of .17-.35% wt. ECF No. 133 at 10. According to Mr. Clark, Southwestern had no confidentiality restrictions on the document. ECF No. 144 at 21; Clark Depo., ECF No. 133-3 at 5. Southwestern sold the CYMAX tubing for a couple of years, but it was a commercial disaster because the coils, while stronger, fatigued faster than other products, shortening the useful life. ECF No. 144 at 6, 17; Clark Depo., ECF No. 144-10 at 3-5. Eventually, Southwestern stopped production and left the market for coiled tubing. ECF No. 144 at 17; Clark Depo., ECF No. 133-3 at 6.

In 2010, Tenaris employees discovered the CYMAX furnace in an old facility it owned. This discovery led one of the inventors of the patent to suggest heat treatment on coiled tubing. ECF No. 133 at 6. Three years later, Tenaris filed the application for the '256 patent. Shortly thereafter, one of the patent inventors contacted Mr. Clark, who provided Tenaris with a copy of the CYMAX brochure. Clark Depo., ECF No. 133-3 at 3.  It was distributed quickly to the team working on

4

the '256 patent. ECF No. 133 at 7-8. Within days, one of the inventors, Bruce Reichert, emailed the lead inventor, Martin Valdez, asking him to "look at the chemistries (page 30 for instance for CYMAX100). This is essentially our chemistry for HSS90 (A606HS)." ECF No. 133 at 9; ECF No. 133-32 at 12 (Tenaris' response to RFA Nos. 20-22). Valdez sent this brochure to Tenaris' in-house counsel, who forwarded it to outside patent prosecution counsel. ECF No. 133 at 9. The CYMAX brochure was not provided to the Patent and Trademark Office ("PTO") during the application for the '256 patent. ECF No. 144 at 21.

The PTO rejected the '256 patent on obviousness grounds but asked for an affidavit supporting Tenaris' position on non-obviousness. ECF No. 136 at 5 (citing PTO rejection letter dated 11/22/2016, ECF No. 130, Ex. 8). In addition to other issues, the PTO found that the '256 steel chemistries overlapped with the prior art of Valdez (2010/0136363) (Valdez '363 patent) rendering the claimed ranges obvious. ECF No. 130, Ex. 8 at p. 5. Tenaris overcame the rejection with a declaration from Valdez. Global asserts that the CYMAX brochure is prior art that Tenaris should have disclosed to the PTO when applying for the '256 patent. Global further contends that Tenaris did not disclose the CYMAX brochure to ensure it obtained the '256 patent. ECF No. 133 at 9-10.

When applying for the Children Patents, again Tenaris made its new patent prosecution counsel aware of the brochure. ECF No. 133 at 11. Tenaris and its

outside counsel decided to provide the brochure to the PTO, however, "Tenaris dissected the CYMAX Brochure into five parts," submitting them as five separate references out of order from the way they are kept in the brochure and removed the title page, divider pages, and the "Specifications section, including page 30 showing the chemistry for CYMAX100." *Id.*

The PTO repeatedly rejected each of the Children Patent Applications as anticipated or obvious based on a 2012 Valdez Publication, another Tenaris application relating to its heat treatment program, having disclosed all or enough of the elements of the claims that their claims would have been obvious. *Id.* at 12; ECF No 133-27 ('686 Patent). The lead inventor of the '256 patent, Valdez, submitted affidavits supporting the Children Patents against the obviousness rejections. ECF Nos. 133-14, 133-16. Notwithstanding these submissions, Tenaris was unable to overcome the obviousness rejections of the Children Patents based on the prior Valdez publication. ECF No. 133 at 13.

The inventors of the 2012 Valdez Publication and the '256 and Children Patents were identical *except* for the addition of Dr. Gonzalo Gomez on the '256 patent and Children Patents. *Id.* at 12. Since the inventors were different, the 2012 Valdez Publication was considered prior art. *Id.* at 13. To overcome the PTO's repeated rejections based on obviousness, Tenaris changed the inventorship of the '256 patent and Children Patents, removing Dr. Gomez. Once the inventors on both

the prior publication and patents were identical, the prior publication was no longer citable as prior art. *Id.* (quoting Tenaris' statement to the PTO, citing Patent applications, ECF Nos. 133-33, 133-34, 133-35). The PTO issued the Children Patents after Tenaris changed the inventorship.

In its motion to compel, Global claims that Tenaris obtained its patents by deceiving the PTO, withholding prior art in prosecuting the main patent, and then altering and withholding a key piece of the prior art in prosecuting the Children Patents. ECF No. 133 at 5. Global asserts that the patents would not have issued if the CYMAX brochure had been disclosed because of the overlapping chemistries. *Id.* at 9-12. Global further claims Tenaris waived its attorney-client privilege with respect to its change of inventorship on the patents. *Id.* at 15. Global contends that Tenaris' actions withholding the material from the PTO amounted to fraud, vitiating any attorney-client privilege under the crime-fraud exception. *Id.* at 19. Global seeks to compel documents withheld as privilege that are in possession of prosecution counsel relating to the CYMAX materials and those relating to inventorship of the three patents at issue. Finally, Global seeks to compel production of the Valdez affidavit submitted in support of the '256 patent that Tenaris clawed back. Global asserts that the privilege, if any, was waived and the affidavit contains direct evidence of Tenaris' fraud on the PTO, vitiating any privilege under the crime-fraud exception to the attorney-client privilege. ECF No. 136 at 12-14.

## II.    LEGAL STANDARD

### A. Inequitable Conduct Defense to Patent Infringement

The essence of Plaintiff's claim, and the focus of the briefing, is inequitable conduct. ECF No. 133. Inequitable conduct is an equitable defense to patent infringement that, if proved, bars enforcement of a patent. *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1285 (Fed. Cir. 2011). To prevail *on the merits*, the accused infringer must prove that the patent applicant misrepresented or omitted material information with the specific intent to deceive the Patent and Trademark Office ("PTO"). *Id.* at 1287. In the case of non-disclosure of information, the accused infringer must prove that the applicant knew of the reference, knew it was material, and made a deliberate decision to withhold it. *Id.* Inequitable conduct regarding any single claim renders the entire patent unenforceable and cannot be cured by reissue. *Id.* at 1288. When an applicant fails to disclose prior art to the PTO, the art must be but-for material, meaning the PTO would not have allowed the claim if it has been aware of the undisclosed art. *Id.* at 1292. An exception to the but-for material requirement applies in cases of affirmative acts of egregious misconduct. In such cases, the misconduct is material. *Id.* The egregious misconduct exception includes the filing of false affidavits. *Id.*

### B. The Attorney-Client Privilege and the Scope of Discovery

Rule 26 of the Federal Rules of Civil Procedure provides:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense.... For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action. Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.

FED. R. CIV. P. 26(b)(1). "The broad scope of permissible discovery is constrained by . . . any relevant privileges, including the attorney-client privilege." *See Pei-Hreng Hor v. Ching-Wu Paul Chu*, No. 4:08-CV-3584, 2010 WL 4284902, at *3 (S.D. Tex. Oct. 22, 2010) (Ellison, J.) (citing FED. R. CIV. P. 26(b)(1), (3)).[6]

"The attorney-client privilege protects the confidentiality of communications between attorney and client made for the purposes of obtaining legal advice." *Id.* (citing *American Standard, Inc. v. Pfizer, Inc.*, 828 F.2d 734, 745 (Fed.Cir.1987)). The attorney-client privilege extends to communications between an inventor and a patent attorney. *See In re Spalding,* 203F.3d at 806. It does not matter whether a

---

[6] Federal Circuit law governs discovery disputes over materials relating to an issue of substantive patent law, and hence governs the questions presented here because the non-disclosure of prior art and change of inventorship took place in a patent-law specific context. *Id.* (citing *In re Spalding Sports Worldwide, Inc.,* 203 F.3d 800, 803 (Fed. Cir 2000) (finding that Federal Circuit law applied because determination of the attorney-client privilege to invention record clearly implicated substantive patent issues) and *In re Echostar Commc'ns Corp.,* 448 F.3d 1294 (Fed.Cir.2006) (applying Federal Circuit law to determine the extent to which a party waives attorney-client privilege by asserting the advice of counsel to defend a charge of willful patent infringement)). The application of the crime-fraud exception to the attorney-client privilege in the context of committing a fraud on the PTO during a patent application implicates patent law and Federal Circuit law governs. *See id.*

communication "contain[s] technical information" or "refer[s] to prior art," as long as the "overall tenor of the document indicates that it is a request for legal advice or services." *Id.* "This privilege is 'recognize[d] in order to promote full and frank communication between a client and [its] attorney so that the client can make well-informed legal decisions and conform [its] activities to the law.'" *Hreng Hor*, 2010 WL 4284902, at *3 (citing *In re Echo Star Commc'ns Corp.*, 448 F.3d at 1300–01).

When a party waives privilege as to a particular communication, the waiver applies to all other communications relating to the same subject matter. *Id.* at *4. "'The overarching goal of a waiver in such a case is to prevent a party from using the advice he received as both a sword, by waiving privilege to favorable advice, and a shield, by asserting privilege as to unfavorable advice.'" *Id.* (quoting *In re Echo Star Commc'ns Corp.*, 448 F.3d at 1303). In patent cases, the extent of waiver is generally narrowly construed. *Id.*

The temporal scope of a waiver is generally limited to the period when the disclosing party placed the privileged material at issue. *See Windbond Electronics Corp. v. Int'l Trade Commn'n*, 262 F.3d 1363, 1375-76 (Fed.Cir.2001). If waiver of the privilege is renewed beyond the initial disclosure, the temporal scope of the waiver may be extended accordingly. *Id.*

## III.   THE MOTION TO COMPEL PRODUCTION OF THE VALDEZ AFFIDAVIT AND THE CYMAX DOCUMENTS

Plaintiff seeks production of the clawed back draft Valdez affidavit, asserting the affidavit is not privileged, Defendant waived any privilege through its voluntary production, and the crime-fraud exception applies. ECF No. 136. In addition, Plaintiff seeks production of all CYMAX documents withheld under a claim of privilege, asserting, *inter alia*, that the crime-fraud exception vitiated any privilege regarding these documents. ECF No. 133. Defendant claims that the affidavit is privileged, production was inadvertent, and the crime-fraud exception does not apply. ECF No. 144.

### C. Inadvertent Production of the Valdez Affidavit.

The Valdez Affidavit was submitted to the PTO to support the '256 patent after the PTO rejected it on obviousness grounds. ECF No. 133 at 10; ECF No. 136 at 8. During discovery, Tenaris produced a draft of the affidavit to Global. Valdez Aff., ECF Nos. 133-14 & 133-36. Plaintiff attached the affidavit as an exhibit to its motion to compel and relies on the disclosures in it to support waiver of attorney-client privilege and crime-fraud exception arguments. ECF No. 133 at 10-12; ECF No. 136. Tenaris claims that the Valdez draft affidavit is an attorney-client privileged communication, and its production was inadvertent. ECF No. 144 at 26; Partridge Aff., ECF No. 144-31.

11

### 1. Is the affidavit privileged?

The burden to demonstrate attorney–client privilege is on the party asserting privilege. *Corona v. Chevron Corp.*, No. H-07-3190, 2008 WL 11483069, at *2 (S.D. Tex. June 8, 2008). Defendant's response focuses on the inadvertent production argument and almost assumes privilege. ECF No. 144 at 26. Because Plaintiff attached the affidavit to its motion, however, the Court had it to review for privilege. Valdez Aff., ECF No. 133-14.

There is no dispute that Tenaris and its counsel prepared the affidavit to be submitted to support the '256 patent application against the obviousness rejection. ECF No. 133 at 10; ECF No. 136 at 8; ECF No. 144 at 26. Defendant asserts that the "draft declaration contains privileged communications between Tenaris and its outside patent counsel." ECF No. 144 at 26. Based on the Court's review of the draft affidavit, it contains questions from the prosecuting patent attorney to the lead inventor asking questions about the various representations in the affidavit and Valdez provides responses. *Id.*; Valdez Aff., ECF Nos. 133-14, 133-36. Contrary to Plaintiff's arguments that the communications exchanged are simply facts regarding technology and not made for the purpose of obtaining legal advice, ECF No. 136 at 10, the issue of patentability is decidedly legal in nature, and the communications within the affidavit were privileged. *See Medicines Co. v. Mylan Inc.*, 936 F.Supp.2d 894, 901 (N.D. Ill. 2013). There is one paragraph that goes to the crime-fraud

exception that the Court will address later.

### 2. Was the production inadvertent?

To determine whether an inadvertent disclosure waives attorney–client privilege, the following factors are relevant: (1) the reasonableness of precautions taken to prevent disclosure; (2) the amount of time taken to remedy the error; (3) the scope of discovery; (4) the extent of the disclosure; and (5) the overriding issue of fairness. *Corona*, 2008 WL 11483069, at *2 (citing *Alldread v. City of Grenada*, 988 F.2d 1425, 1433 (5th Cir. 1993)). Although no factor is conclusive, the party seeking to preserve privilege has the burden to demonstrate that the circumstances surrounding disclosure favor continued protection. *Id.* The party claiming privilege will not be relieved of the consequences of its carelessness if the circumstances do not clearly demonstrate that continued protection is warranted. *Id.*; *see also Callan v. Christian Audigier, Inc.*, 263 F.R.D. 564, 566 (C.D. Cal. 2009) (self-serving, conclusory declarations cannot satisfy the burden to establish inadvertent disclosure).

Defendant states its precautions were reasonable. ECF No. 144 at 27. In a conclusory supporting affidavit, counsel states that the firm uses the Relativity platform, and the privilege screening procedures search every document for potentially privileged terms. Partridge Aff., ECF No. 144-3. Thousands of documents were apparently reviewed, and the Valdez declaration was caught by the

13

privilege screen. *Id.* Even though the draft was caught by the privilege screen, it was produced and marked Attorneys Eyes Only. ECF No. 133 at 8. Plaintiff argues this is evidence of intentional production. *See id.* The Defendant's sole explanation is that the declaration "was mistakenly produced." Partridge Aff., ECF No. 144-3.  The Court concludes from this that human error resulted in the inadvertent production of this document.

No one disputes that, upon learning of the production after Plaintiff filed its motion to compel referencing the declaration and its import on Plaintiff's fraud on the PTO case, Defendant immediately clawed back the document. ECF No. 136 at 9; ECF No. 144 at 26. Defendant asserts that Plaintiff's discovery requests required the review of thousands of documents, production of almost one thousand pages, and only this five-page declaration was mistakenly produced. ECF No. 144 at 26-28. Defendant argues that fairness requires continued protection of the affidavit because its disclosure would be highly prejudicial to Tenaris. *Id.* at 28-29.

In sum, these factors favor keeping the draft affidavit privileged under the inadvertent production doctrine.

### D. The Crime-Fraud Exception to the Attorney-Client Privilege

Plaintiff argues that, if the draft Valdez declaration is privileged, the crime-fraud exception applies and relies on the facts outlined in its two motions. ECF No. 136 at 9. Defendant argues that the crime-fraud exception does not apply, and

the Valdez declaration cannot be used to determine whether the exception applies, citing *United States v. Zolin*, 491 U.S. 554, 573 (1989).

"The attorney-client privilege is designed to encourage clients to make full disclosure of facts to counsel so that [counsel] may properly, competently, and ethically carry out [the] representation." *In re Grand Jury Proc.*, 604 F.2d 798, 802 (3d Cir. 1979) (citing *Fisher v. United States*, 425 U.S. 391 (1976)). The purpose is to promote the proper administration of justice. *Id.*; *see United States v. Zolin,* 491 U.S. 554, 562 (1989) (quoting *Upjohn Co. v. United States,* 449 U.S. 383, 389 (1981) (the privilege promotes "broader public interests in the observance of law and administration of justice.")).

The privilege is subject to several exceptions, including the crime-fraud exception. The crime-fraud exception recognizes that a "client has no legitimate interest in seeking legal advice in planning future criminal activities." *In re International Systems & Controls Corporation Securities Litigation,* 693 F.2d 1235, 1242 (5th Cir.1982). Thus, if lawyer is consulted, not with respect to *past* wrongdoing but to *future* crime or fraud, the crime-fraud exception to the attorney-client privilege applies and the communications made in furtherance of the crime or fraud are not protected. *Zolin,* 491 U.S. at 562-63 ("It is the purpose of the crime-fraud exception to the attorney-client privilege to assure that the 'seal of secrecy,' ... between lawyer and client *does not extend* to communications 'made for the purpose

of getting advice for the commission of a fraud' or crime."); *accord In re Grand Jury Subpoena*, 419 F.3d 329, 335 (5th Cir. 2005) ("Under the crime-fraud exception to the attorney-client privilege, the privilege can be overcome where communication or work product is intended to further continuing or future criminal or fraudulent activity."); *In re Burlington N., Inc.*, 822 F.2d 518, 524 (5th Cir. 1987) (same).

The party seeking to invoke the crime-fraud exception bears the burden of demonstrating that the exception is applicable. *E.g., Chevron v. Uhl, Baron, Rana & Assoc.*, 633 F.3d 133, 166 (3rd Cir. 2011). Thus, the party must make a *prima facie* showing "that the attorney-client relationship was intended to further criminal or fraudulent activity." *In re Grand Jury Subpoena*, 419 F.3d at 335. After the party seeking disclosure meets its *prima facie* showing, the only attorney-client communications falling within the scope of the crime-fraud exception are those shown to hold "some valid relationship" to the *prima facie* violation such that they "reasonably relate to the fraudulent activity." *In re Grand Jury Subpoena*, 419 F.3d 329, 346-47 (citations omitted); *see also Burlington N.,* 822 F.2d at 525 n. 5.

### 1. The affidavit will not be considered in determining application of the crime-fraud exception.

In its motions, and then in emails to the Court after the argument, Plaintiff tendered the Valdez declaration as direct evidence of the fraud on the PTO and argues that the Court may review it to make the determination of the *prima facie* case because the document had not been adjudicated to be privileged. *Zolin*, 491

U.S. at 573-75. In its presentation and emails to the Court after the argument, Defendant relied on *Zolin* to argue that the court may not consider the affidavit in making that determination.

Although Plaintiff is correct that prior to this Order, the Valdez affidavit had not been adjudicated as privileged and would have allowed the Court to examine it to determine whether the crime-fraud exception applies, that argument is now moot because the Court found the affidavit to be privileged. Thus, the Court cannot consider the declaration in making the crime-fraud determination until it first determines whether Plaintiff has made a showing of a factual basis adequate to support a good faith belief by a reasonable person that the affidavit contains evidence of the fraud. *Zolin*, 491 U.S. at 572-73; *e.g., In re Chevron Corp.*, 633 F.3d 153, 167 (3d Cir. 2011) (performing in camera review of document under *Zolin* because there was a "factual basis adequate to support a good faith belief by a reasonable person ... that in camera review of the materials may reveal evidence to establish the claim that the crime-fraud exception applie[d]").

### 2. Plaintiff's evidence supports a factual basis that the affidavit contains evidence of fraud.

Plaintiff points to the evidence in both of its motions to support the factual basis of fraud. In sum, Plaintiff's evidence consists of Tenaris' knowledge of the CYMAX materials, the inventors' review and discussion of those materials and the overlapping specifications with the '256 patent, Defendant's failure to disclose this

material to the PTO during prosecution of the '256 patent despite the internal recognition of its significance, and when the materials were submitted during the prosecution of the Children Patents, they were not produced as originally maintained. Instead, the evidence shows that Defendant tendered the materials to prosecuting counsel, and counsel reorganized the material, removing the title page, divider pages, and entire Specifications section, which purportedly contained information on overlapping chemistries, particularly significant in light of the PTO's previous rejection of the '256 patent based on obviousness that included overlapping chemistries. Similarly, the PTO rejected the Children Patents on obviousness grounds, which the inventors were only able to overcome by changing the inventors so that the prior art creating the issue would no longer be considered. Plaintiff supports each of these facts with supporting evidence in the record, most of which was attached to its motions and referenced in the Background section above.

The Court finds this sufficient to make a showing that a reasonable person would expect the draft affidavit to contain evidence of fraud, justifying in camera review of the offending paragraph in the affidavit. None of the evidence Defendant refers to changes the Court's conclusion.[7]

### 3. *In camera review of the affidavit reveals intent to commit fraud.*

In the relevant paragraph, Valdez states:

---

[7] Defendant's evidence will be discussed in more detail when addressing the CYMAX materials.

> The claimed coiled tubing on the range of properties we are claiming (specially the one we are selling 110-125-140 ksi) was not explore[d] before. There was an attempt called Cymax (I include a paper/document for your reference). The intention was to go to higher than 70 ksi, they produce 100 ksi but the chemistry was C:0.13-0.17 (which is outside our carbon range). In page 30 of the Cymax.pdf doc you can see the spec of the CYmax 100 which was 0.13-0.17 Carbon. *I am not sure it is a good idea to disclose this document.*

ECF No. 133-36 at 14 (emphasis added).

This statement, questioning whether it is a good idea to disclose the CYMAX material, is a rare example of direct evidence of an intent to defraud. *See Therasense, Inc.*, 649 F.3d at 1290 (direct evidence of deceptive intent is rare, allowing courts to infer intent from circumstantial evidence); *GFI, Inc. v. Franklin Corp.*, 265 F.3d 1268, 1274 (Fed. Cir. 2001) ("facts in inequitable conduct cases rarely include direct evidence of admitted deceitful conduct"). Not only is it evidence of intent to commit fraud, but it is also not a privileged communication because communications regarding future fraudulent conduct are not protected. *Zolin,* 491 U.S. at 562-63.

Defendant argues that intent to deceive must be the single most reasonable inference from the evidence, and when there are multiple reasonable inferences that may be drawn, intent to deceive cannot be found. ECF No. 144 at 29.  Defendant suggests several inferences such as Valdez's concern that the document could have been confidential, or that the document does not admit the failure of the CYMAX product, or the possibility of using Chitwood instead. *Id.* However, the Court need not draw any inferences when presented with direct evidence of fraud. The statement

speaks for itself. Only when inferring intent from indirect or circumstantial evidence, must the Court consider the reasonable inferences to be drawn from the evidence. *See Therasense, Inc.*, 649 F.3d at 1290; *GFI, Inc.*, 265 F.3d at 1274.

Even if the Court were to consider the reasonable inferences to be drawn from the evidence, Defendant does not point to a shred of evidence to support these hypothetical inferences. To the contrary, the Court finds that the only record evidence cited on intent is what has already been referenced: Valdez's knowledge of this prior art, knowledge of its materiality given the inventors' prior discussions of overlapping chemistries and the PTO's rejection of the '256 patent on obviousness grounds based on chemistry overlap with another patent,[8] and the Children Patents repeated rejections as obvious based on Valdez's prior publication, all lend support for an inference that this statement suggesting not to disclose CYMAX brochure to the PTO is evidence of an intent to defraud. In the affidavit, Valdez points to the chemistries, and then says it is not a good idea to disclose it. In fact, the CYMAX materials were not disclosed to the PTO during the prosecution of the '256 patent, either before or after the affidavit was submitted to the PTO, evidencing that this expressed intent was carried out. The affidavit also does not disclose the CYMAX chemistries. Thus, to the extent any inference is required, intent to defraud the PTO

---

[8] The Court also takes note that Valdez was the lead inventor and experienced in the patent process, lending further support for the finding that he understood the import of the CYMAX brochure on the patent application process.

20

is the single most reasonable inference to be drawn. *See GFI, Inc.*, 265 F.3d at 1275 (despite patentee's knowledge and discussions of prior art during pendency of the patent application, no disclosure was made to the PTO, proving threshold deceptive intent).

### 4. The CYMAX materials withheld were material.

Materiality is an element of the inequitable conduct case. *Therasense, Inc.*, 649 F.3d at 1290-93. Plaintiff concedes that, for the crime-fraud exception, it must make a *prima facie* showing of the materiality of the CYMAX materials Defendant withheld from the PTO. *See* ECF No. 164 at 1-2. Based on the evidence already recited, the Court finds that Plaintiff has made a *prima facie* showing that the CYMAX brochure and particularly the four page Specifications section were material to the prosecution of the '256 patent.[9]

Defendant's response that it had a good faith belief that the documents were confidential is not credible. The affidavit says nothing about the CYMAX materials being confidential. As experience patent counsel would know, the PTO deals with confidential information daily and has procedures in place for the proper handling

---

[9] But-for materiality is required for inequitable conduct, but in an exception to the but-for material requirement applies in cases of affirmative acts of egregious misconduct. *Therasense, Inc.*, 649 F.3d at 1292. In such cases, the misconduct itself is material and includes the filing of false affidavits. *Id.* Plaintiff has argued that the Valdez affidavit failed to disclose the CYMAX prior art and therefore it was a false affidavit filed with the PTO, falling under the egregious misconduct exception. The Court agrees. Nonetheless, the Court finds that the evidence establishes but-for materiality as discussed herein.

of confidential or proprietary information. *See, e.g.,* Manual of Patent Examining Procedure ("MPEP") § 724 (9th Ed. June 2020).

Further, Defendant argued that the Specifications were confidential based on a reference in one of the brochure documents that referred to proprietary information and argued that it was not publicly available. ECF No. 144 at 21-22. As Defendant itself showed, however, this CYMAX product was a failure and Southwestern is no longer in the coiled tubing market. *Id.* So, it is not clear on whose behalf Defendant is asserting the proprietary nature of these chemistries. Plaintiff claims that this information is available on the internet. ECF No. 133 at 21 n.4. As it turns out, one of Southwestern's employees, Mr. Clark, who provided Tenaris with the CYMAX brochure, works for Tenaris and was at its disposal to answer any questions about confidentiality, which he ultimately did in his deposition, testifying that the CYMAX brochure was not confidential. Clark Depo., ECF Nos. 133-3 at 5. Defendant also contended that the Specifications were confidential based on a stamp that the document was "CONTROLLED." ECF No. 144 at 21-22. However, the only evidence is to the contrary, that a CONTROLLED stamp means that it is the latest version of the document, having nothing to do with confidentiality. Padron Aff., ECF No. 149-10.

In discussing the materiality of the CYMAX brochure, Defendant insisted that it was merely cumulative of the Chitwood article, another document that it submitted

to the PTO. *E.g.,* ECF No. 144 at 18; ECF No. 155 at 13. Defendant asserted that the patent examiner would have known the chemistries based on the steel disclosed in the Chitwood article because they are engineers and scientists who are persons of ordinary skill in the art. ECF No. 155 at 13 (citing *In re Berg*, 320 F.3d 1310, 1315 (Fed. Cir. 2003) ("As persons of scientific competence in the fields in which they work, examiners and administrative patent judges on the Board are responsible for making findings, informed by their scientific knowledge, as to the meaning of prior art references to persons of ordinary skill in the art and the motivation those references would provide to such persons.")). Tenaris' argument that the CYMAX brochure was cumulative of Chitwood and therefore was not material is belied by the fact that Tenaris submitted the CYMAX brochure to the PTO in prosecuting the Children Patents, albeit not the complete brochure in the order it was maintained.

The Court finds that Defendant's arguments lack merit. "[T]he duty of candor requires disclosure of *all* information material to patentability, including non-public information, to the Patent Office." *Semiconductor Energy Lab'y Co. v. Samsung Elecs. Co.*, 204 F.3d 1368, 1374 (Fed. Cir. 2000), *amended* (Apr. 5, 2000) (citing G*olden Hour Data Sys., Inc. v. emsCharts, Inc.*, 614 F.3d 1367, 1374 (Fed. Cir. 2010) (undisclosed information in withheld brochure considered material, even if not prior art)). A withheld reference may be highly material when it discloses a more complete combination of relevant features, even if those features are before the

patent examiner in other references. *Id.* Thus, the fact that the Chitwood article was already disclosed, and contained similar information, does not mean that a patent examiner would not have wanted to see the four pages of the Specifications that Tenaris withheld. One of those four pages identified the chemistries in a chart that was not found in the Chitwood article. Particularly, as here where the '256 patent was initially rejected on obviousness grounds based in part on overlapping chemistries with other prior art, this would have been material.

Since this is a discovery motion, and not a determination on the merits, the sole question is whether Plaintiff's evidence is sufficient to make a *prima facie* case of fraud such that the Court can consider the affidavit. The Court finds that Plaintiff has made a *prima facie* case that the attorney-client relationship was used to further the commission of a fraud on the PTO by the withholding of the CYMAX brochure. *See GFI, Inc.*, 265 F.3d at 1275 ("We have held deceptive intent to be shown where a patentee withheld references and made an argument for patentability that could not have been made had the art been disclosed."). At trial, Tenaris may ultimately prove that the CYMAX brochure was cumulative and not material, but for the purposes of this motion to compel, Defendant's evidence is insufficient to conclusively rebut Plaintiff's evidence. It simply evidences that there are issues of fact that will be resolved at trial.

The Court determines that Plaintiff has established a *prima facie* case that the

affidavit contains evidence that the attorney-client relationship was used in furtherance of committing a fraud on the PTO. With regard to the scope of the required production, Plaintiff's evidence is sufficient to vitiate any attorney-client privilege as to the Valdez affidavit. The Court also determines that this evidence is sufficient to require Tenaris to produce the documents withheld as privileged related to the CYMAX documents, as Plaintiff requests in its motion to compel. ECF No. 133.[10]

The Court orders that Defendant produce the Valdez affidavit and all documents relating to the CYMAX materials that were withheld under a claim of privilege. There should not be many documents that fall into that category. To the extent that there are any issues, the Defendant may seek in-camera review of documents that raise a specific question as to whether production is required. However, the Court admonishes the parties to work together and comply with the pre-filing conference requirements.

---

[10] Defendant submitted deposition testimony from outside counsel explaining why the CYMAX documents had been reorganized when submitted with the Children Patents, purportedly to ensure that the patent examiner would consider them. Musselman Depo., ECF No. 197-1 at 6-8. In addition, he testified that the patent examiner was not considering chemistries with the Children Patents, implying that the CYMAX Specifications would not be relevant or material. *Id.* at 10. This evidence does not refute this information would have been material to the '256 patent application. Moreover, this testimony about the attorney's state of mind, knowledge of prior art, and communications with the PTO may constitute a further waiver of the attorney-client privilege. *GFI, Inc.*, 265 F.3d at1273. But, given the ruling on the crime-fraud exception, the Court does not need to resolve this issue.

## IV.   THE MOTION TO COMPEL PRIVILEGED DOCUMENTS REGARDING THE CHANGE OF INVENTORSHIP

It is not disputed that the PTO rejected the Children Patents as anticipated or obvious based on the 2012 Valdez publication, finding that this prior publication disclosed all elements of the claims in the Children application or enough that the claims would have been obvious. ECF No. 133 at 12-13. The inventors of the 2012 Valdez publication and the '256 patent were the same with the addition of Dr. Gomez on the '256 patent. Defendant's attempts to persuade the PTO that the claims were not anticipated or obvious failed. *Id.* at 13. Because the '256 inventors were not identical to the 2012 Valdez publication, the Valdez publication was considered prior art. Unable to convince the PTO that the claims were not obvious, ECF No. 149 at 1-2 (citing patent rejections ECF Nos. 149-1 – 149-4), Defendants changed the inventors of the '256 patent to remove Dr. Gomez. *Id.* (citing to the patent applications ECF Nos. 133-33, 133-34, 133-35). Once that was done, the prior publication could no longer be cited as prior art because the inventors were identical. *Id.*

"Inventorship is a question of who actually invented the subject matter claimed in a patent." *Winbond Elec. Corp. v. ITC*, 262 F.3d 1363, 1371 (Fed. Cir. 2001). The Patent Act authorizes corrections to the listing of the inventor when through an error without deceptive intent a person is named as the inventor or is not named as the inventor. *Id.* (citing 35 U.S.C. § 256 (1999)). The party challenging a

change in inventorship must prove that the correction was improper. *Id.*

Plaintiff alleges that for five years Dr. Gomez has been named as an inventor of the three patents. All four inventors—Valdez, Reichert, Jorge Mitre, and Dr. Gomez—have sworn they were the inventors in 2014 and filed four applications attesting to joint inventorship status. ECF No. 133 at 13. Dr. Gomez testified that he believed he was an inventor when the patent applications were filed. Gomez Depo., ECF No. 133-31 at 3. He further testified that, at the end of 2017, Valdez told him that he would be contacted by a person from the intellectual property office because they wanted to review his contribution to the patent. *Id.* A person from Defendant's intellectual property office told Dr. Gomez that he would have a meeting with Wes Musselman so the attorney could help Dr. Gomez review his contribution to the patent. *Id.* at 4.

Dr. Gomez testified that he had two meeting with outside counsel Wes Musselman for several hours and reviewed his contribution to the patent. *Id.* at 3. Dr. Gomez testified he understood from that conversation "that to be an inventor of a U.S. patent, you need to do a significant contribution to the conception of at least one of the claims." *Id.* at 3-4, 6. He reviewed the claim, patent specifications, email, and presentations. *Id.* at 4. After five years as a named inventor, Dr. Gomez suddenly realized that the was not an inventor after talking to outside prosecution and litigation counsel. *Id.* at 4, 5; ECF No. 133 at 13. Those

attorneys conducted detailed interviewed with the inventors and relied on no documents in deciding to submit a change in inventorship. Def. Supp. Ans. Interrog., ECF No. 133-8 at 5.

During re-direct examination, Tenaris' counsel asked Dr. Gomez about his communications with its counsel:

> Q. Did . . . Jan-Willem Louwaard -- ever tell you that you were not an inventor on the '256 patent or the continuations?
>
> A. No, he didn't tell me nothing about that.
>
> Q. Did Wes Musselman ever tell you that you were not an inventor?
>
> A. No, he didn't tell me that.

Gomez Depo., ECF No. 133-31 at 5-6.

Plaintiff argues that Defendant waived its attorney-client privilege as to the inventorship because it put privileged communications between Dr. Gomez and Wes Musselman at issue, using it as a sword relaying on a partial disclosure of attorney discussions with Dr. Gomez, and hiding behind the privilege as a shield withholding information on the same topic. ECF No. 133 at 16; ECF No. 149 at 4. Moreover, Dr. Gomez testified that his determination that he was no longer an inventor was based on his discussions with Wes Musselman, where Musselman explained the law of inventorship to him. ECF No. 133-31 at 3-6.

Defendant disputes that it is relying on advice of counsel as proof that Dr. Gomez is not an inventor. ECF No. 155 at 10. Further, Defendant argues that its

questioning of Dr. Gomez did not reveal any privileged communications it just asked yes or no questions to dispel the misimpression of wrongdoing left by Plaintiff's earlier questioning. *Id.*

The Court finds that this case is the same as *Winbond Elec. Corp.*, 262 F.3d at 1373. In that inequitable conduct case, the patentee sought a change of inventorship. The added inventor testified that:

> The standard for inventorship as it relates to the '903 patent has been explained to me. Based on my understanding of that standard, I hereby state that I have made an inventive contribution to the subject matter claimed in the '903 patent, whereby I am a co-inventor of the claimed subject matter of the '903 patent.

*Id.* The Federal Circuit affirmed the Commission's determination that the patentee waived its privilege, finding that the inventor

> understood that he was an inventor upon receiving an explanation of the law . . .. Thus, the Commission correctly found that [the patentee] put at issue [the inventor's], and thus its attorneys', understanding of inventorship law . . .. This court has held that a patentee's inadvertent waiver of attorney-client privilege in a patent infringement litigation is a general waiver "for all purposes.

*Id.* at 1376. Here, Dr. Gomez testified after two meetings with outside counsel where they discussed inventorship law and his contributions to the patents over several hours, he later determined that he was not an inventor as he had originally thought. Thus, Dr. Gomez's testimony put at issue his and counsel's understanding of inventorship law. *Id.* Based on this ruling, the Court need not address the other waiver issues.

Thus, Plaintiff request for an order compelling production of documents withheld as attorney-client privileged communication that relate to the inventorship of the three patents is granted. *See In re EchoStar Comm. Corp.*, 448 F.3d at 1299 (scope of waiver of attorney-client privilege as to a particular communication is that the waiver applies to all other communications relating to the same subject matter).

## V.    CONCLUSION

The Court **ORDERS** that the Plaintiff's motions to compel, EFC Nos. 133 and 136, are **GRANTED.** Defendant shall produce the documents withheld as privilege that relate to the CYMAX brochure and the inventorship of the three patents and the Valdez affidavit. The Court further **ORDERS** that Defendant's motion to strike, ECF No. 166, is **DENIED AS MOOT.**

Signed at Houston, Texas, on March 26, 2021.


_____
**Dena Hanovice Palermo**
**United States Magistrate Judge**